UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

TRICIA NADEAU,                          :
      Plaintiff,                    :
                                :
v.                                      :          No. 3:15cv1705 (DJS)
                                :
ECOLAB, INC.,                           :
      Defendant.                    :

## MEMORANDUM OF DECISION

The plaintiff, Tricia Nadeau ("Nadeau")[1], brings this action against the defendant, Ecolab,

Inc. ("Ecolab"), alleging employment discrimination in violation of Connecticut law. Pending

before the Court is a motion for summary judgment filed by the defendant. For the reasons stated

below, the defendant's motion for summary judgment (doc. # 28) is granted.

## I.  FACTS

Before reciting the facts which the Court finds to be undisputed, the Court wishes to

address an issue concerning the plaintiff's filings in opposition to the defendant's motion. The

Rules of the United States District Court for the District of Connecticut contain specific

requirements pertaining to papers filed in opposition to a motion for summary judgment. Those

papers must include a "'Local Rule 56(a)2 Statement,' which states in separately numbered

paragraphs meeting the requirements of Local Rule 56(a)3 and corresponding to the paragraphs

contained in the moving party's Local Rule 56(a)1 Statement whether each of the facts asserted

by the moving party is admitted or denied." L. Civ. R. 56(a)2.

In the Local Rule 56(a)2 Statement, each denial of a fact asserted by the moving party

_____

[1]During the time of her employment at Ecolab, Nadeau was also known as Tricia Clavette
and Tricia Farrand.

"must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial. . . . The 'specific citation' obligation of this Local Rule requires counsel and pro se parties to cite to specific paragraphs when citing affidavits . . . and to cite to specific pages when citing to deposition or other transcripts or to documents longer than a single page in length." L. Civ. R. 56(a)3. Failure to provide these specific citations "may result in the Court deeming certain facts that are supported by the evidence admitted . . . ." *Id.*

In opposing the Ecolab's motion for summary judgment Nadeau initially filed a document entitled "Plaintiff's Local Rule 56(a)(1) Statement." (Doc. # 37). That document did not comply with the requirements of Local Rule 56. The Court subsequently provided Nadeau with an additional opportunity "to file and serve a Local Rule 56(a)2 Statement that fully complies with all requirements of the Local Rules." (Doc. # 39, at 3).

In response to the Court's directive Nadeau filed her Local Rule 56(a)2 Statement. As subsequently pointed out by Ecolab, many of Nadeau's denials of factual allegations "fail[] to cite any evidence to support her denials . . . ." (Doc. # 42, at 1). For example, paragraph 25 of Ecolab's Local Rule 56(a)1 Statement refers to Nadeau's performance review for the year 2012 and quotes specific language from that review. In her Local Rule 56(a)2 Statement, Nadeau states that paragraph 25 is "[d]enied as [the] document speaks for itself." (Doc. # 40, at 2, ¶ 25). The Local Rules clearly state that "each denial in an opponent's Local Rule 56(a)2 Statement must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or evidence that would be admissible at trial." L. Civ. R. 56(a)3. "Counsel and pro se parties are hereby notified that failure to provide specific citations to evidence in the record as

required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted . . . ." *Id.* Nadeau's numerous responses stating that facts alleged by Ecolab are "denied as [the] document speaks for itself" fail to comply with the specific citation requirement of the Local Rules. To the extent that the defendant's factual assertions are properly supported by the evidence and the plaintiff's denials fail to provide specific citations to evidence that supports those denials, the Court will deem those assertions admitted.

The defendant Ecolab, which is a Delaware corporation with a principal place of business in Minnesota, is in the business of providing water, hygiene, and energy technologies and services. Among other things, Ecolab sells cleaning products and equipment to customers in food-related industries, as well as to schools and other facilities. In order to promote its business, Ecolab seeks to develop relationships with distributors that sell Ecolab products to their customers.

The plaintiff Nadeau, a Connecticut resident, started working at Ecolab on December 5, 2005. At all times relevant to this action, Nadeau held the position of Distributor Sales Development Manager ("DSDM") at Ecolab, working from a home-based office in Berlin, Connecticut and traveling within her assigned region as necessary.

On January 1, 2011, Nadeau began reporting to Jason Krisher ("Krisher"), Ecolab's Regional Assistant Vice President for Distributor Sales and Facility Care in the Northeast, and continued to report to him for the remainder of her time at Ecolab. At the beginning of 2011 Nadeau was the DSDM for the New England market and covered sales in Connecticut, Massachusetts, and Rhode Island. Later that year, Krisher offered Nadeau the opportunity to transfer to an open position in the New York metro territory that would focus on developing a

new distributor, Strauss Paper ("Strauss"). Nadeau accepted the New York position but continued to work from her home in Connecticut. The individual who was the DSDM for the New York metro territory prior to Nadeau, a man named Joe Curran, was demoted from that position due to performance issues, i.e., not meeting his sales goals.

As a DSDM in the New York market, Nadeau was expected to develop a business relationship between Strauss and the Ecolab sales team in New York, which was led by Area Manager Chuck Melnyk ("Melnyk"). When Nadeau began working in the New York territory, she found Melnyk to be a difficult person to work with and a male Ecolab District Manager suggested that she "Google how to deal with a dictator." (Doc. # 29-1, at 8, p. 23:13-14). Nadeau has no information about how Melnyk treated other Ecolab employees, including another female DSDM, Brigitte McCaughey, who worked with him.

On one or two occasions, Nadeau complained to Krisher that Melnyk swore at her over the phone. Krisher spoke to Melnyk about this complaint and Melnyk denied swearing over the phone at Nadeau. Krisher did not pursue this issue with Human Resources because Nadeau "had only addressed it once, maybe twice at the most, and it was never addressed again . . . . I did not feel it was something we needed to escalate at the time." (Doc. # 37-1, at 9, p. 25:6-8, 12-14). Nadeau also complained to Krisher about Melnyk yelling at her. Krisher spoke to Melnyk about this complaint and Melnyk denied yelling at Nadeau.

In 2011 and 2012, Nadeau was quite successful in establishing a business relationship with Strauss on behalf of  Ecolab. For the year 2012 Krisher nominated her for, and she was awarded, DSDM of the Year for Facility Care. Establishing her own individual relationship with Strauss was only one of Nadeau's job responsibilities. As a DSDM she was also expected to

foster collaboration between Ecolab and Strauss so that the Ecolab associates and the Strauss associates worked together without the need for Nadeau to always be involved in bringing the two teams together.

Nadeau's performance review for 2012, which noted that she "outperformed everyone in the role of DSDM in 2012," included the following statement under the heading "Improve Distributor Relationships":

> In 2012, significant strides were made to improve the relationship between . . . Strauss Paper and Ecolab. Overall we had a great improvement. This is one area that will need continued focus, though, in 2013 as not all the Ecolab team is engaged with Strauss and their "go-to" person is always Trish. The comfort level between Strauss and Ecolab only exists between a few on both side[s].

(Doc. # 29-5, at 2). One of the expectations for 2013 specified in Nadeau's 2012 performance review was "to have a majority of the Ecolab Field Team that is trained in Facility Care working with Strauss [team members] on a consistent basis." (*Id.* at 4-5). Development actions articulated for Nadeau for the year 2013 included developing a monthly newsletter for distribution to Ecolab and Strauss team members highlighting the successes of working together; communicating verbally with Melnyk a minimum of two times per month in addition to sending him a monthly updated distributor report by email; and communicating with District Managers as to when she would be in their markets in order to let them know what was being worked on and what support was needed. (*Id.* at 6).

In July 2013, Krisher issued a written warning to Nadeau which specified the following performance issue:

> Continually missing due dates and deadlines for Monthly Paperwork

and Administrative items. Specifically, failing to send your Monthly
Newsletter and Monthly DSDM Scorecard to me by the
required due dates.

(Doc. # 29-6, at 1). The written warning also advised Nadeau that further failure to

comply with the expectations specified in the warning or incidents resulting in customer

satisfaction issues could result in further disciplinary action up to and including termination.

Nadeau refused to sign the written warning.

Nadeau responded to the written warning in an email message sent to Krisher on July 15,

2013. Nadeau acknowledged that her June newsletter was submitted two days late, but also stated

that "June is the only month where I have been late and I hardly believe that one month deserves

to be written up for." (Doc. # 29-9). With regard to the monthly scorecard, Nadeau responded

that "[n]umbers were not posted prior to me leaving on vacation. The only way I could have done

it on time would have been to submit during my vacation." (*Id.*).

Nadeau's performance review for 2013, dated March 4, 2014, included the following

summary:

Tricia had another very good year in regards to sales numbers
and NBT [new business tracking]. She continued to work
personally with all . . . Strauss [personnel] to drive
the Ecolab offering. As far as personally working and building
a relationship with the Distributor I feel there are few better
than Tricia. The area she will need to work on in 2014 if she
is going to be successful is collaborating with the Ecolab
team. There is still a divide between many of the [team members]
and Tricia. She will need to work to find a way to break down
this barrier and to get each of the [team members] to work with
Strauss on a  daily basis. Her communication with the Area
Manager, Chuck Melnyk, will need to improve dramatically as
well. . . . If the  communication does not improve it will
dramatically impact the overall growth of Strauss and Ecolab.
This will need to take top priority in 2014.

(Doc. 29-10, at 2-3). Nadeau's overall performance rating for 2013 was "Meets Expectations." (*Id.* at 3). In the "Employee Comments" section of the performance review, Nadeau indicated that "[w]hile improvement can always be made in regards to the engagement between Strauss and Ecolab I feel this area has improved quite a bit. I was not hesitant on connecting the two teams at all. In fact I encouraged it all the time." (*Id.*). She also expressed her view that she "did exceed all targets and numbers that were given to me to make budget and am unsure why these areas were downgraded to a meets expectations." (*Id.*).

Krisher issued a second written warning to Nadeau, dated April 4, 2014, that identified concerns with her performance in the areas of communication, accountability, and sales calls. As to the area of communication, the warning letter indicated a "significant concern" regarding communication with Krisher and other Ecolab employees and stated that some of Nadeau's communications had been "condescending and may be considered insubordinate." (Doc. # 29-11, at 1). Going forward, Nadeau needed to "communicate with Chuck [Melnyk] either in person or over the phone at least 2x per month to review collaboration and engagement between the two teams." (*Id.* at 1-2). Nadeau responded to the second written warning in an April 9, 2014 email to Krisher in which she took issue with some of the performance issues identified in the warning letter, e.g., that some of her communications might be considered condescending. She also expressed her concern that she had not been provided with "specific measurable targets" in order to demonstrate that her performance was acceptable. (Doc. # 29-12, at 2).

On June 23, 2014, Krisher had a telephone conversation with Ecolab Human Resources Manager Lisa Albright concerning Nadeau. Albright's notes regarding that conversation indicate, among other things, that "[s]he did a nice job until this past week–she sent Chuck [Melnyk] an

inappropriate email that shows lack of respect/insubordination" and further indicate that the warning period would be extended for an additional 30 days. (Doc. # 29-13). In a June 26, 2014 email to a group of Ecolab employees that included Nadeau, Krisher instructed the named employees to provide him with certain information by July 11, 2014. His email stated that "[y]our feedback is vital for us to continue to provide our segment with what is needed to be successful." (Doc. # 29-17, at 1). Nadeau sent her response to Krisher on July 15, 2014. On July 21, 2014, Krisher sent an email to Nadeau asking her for an explanation as to why her response was late. Nadeau's email response, sent on July 22, 2014, stated that "I made the assumption this did not apply to me [because] [m]y book of business is all commercial and/or contractors, and/or non profit agencies. . . . I can offer very little input on accounts that do not fall under this market as I have not sold them in years." (Doc. # 29-18, at 1).

On July 22, 2014, Krisher sent an email to Melnyk in which he asked if Nadeau was contacting Melnyk at least twice per month by telephone or in person as she was directed to do in the second warning letter. Melnyk replied that Nadeau had not personally spoken to him at least two times per month. At the request of Krisher, Ecolab Human Resources personnel reviewed Naduea's phone records and concluded that those records corroborated Nadeau's failure to personally contact Melnyk at least two times per month.

On August 14, 2014, Nadeau and Melnyk attended a meeting at Strauss with the Strauss Vice-President of Sales and a Strauss sales manager. At that meeting the Strauss Vice-President of Sales stated that the relationship between Ecolab and Strauss was "fractured" due to things not being followed up on and issues with equipment. (Doc. # 29-4, at 6, p. 64:17-23). After the meeting, Melnyk told Nadeau that these were issues that should have been brought to Krisher's

and his attention and "the fact that it wasn't communicated put us in a bad spot with the distributor." (*Id.* at 7, p. 65:9-13). In a written summary of the August 14, 2014 meeting, Melnyk stated that Nadeau had arrived at the meeting, which he described as a "lead generation meeting," unprepared. (Doc. # 29-21, at 2). He went on to indicate that the lead prospect list "had not been updated for some time" and "was about 50% completed with inaccurate data." (*Id.*). He further stated that he asked Nadeau why she hadn't been informed prior to the meeting of the issues raised by the Strauss Vice-President of Sales, and that her response was "I don't handle the field and that she thought this meeting would be a good time to discuss." (*Id.*). At her deposition, Nadeau testified as follows regarding the August 14, 2014 meeting:

> [T]he meeting went well. It was with Strauss managers and myself and him [Melnyk] and the goal was to talk about leads. Strauss had brought up some issue that they were having with installations. Some of the guys were showing up late, some of the guys were showing up unprepared for an install. A Strauss manager took it upon himself to come out and say these things and I didn't know he was going to do it and . . . it was handled. We came up with a game plan to eliminate these things and it wasn't - - this was no real big issue.

(Doc. # 29-1, at 20, p. 49:9-17, 19-22).

Nadeau's employment at Ecolab was terminated in September 2014. A Termination Review form concerning Nadeau states the following as the reason for termination: "Tricia displays a lack of accountability and communication in her role. Tricia is currently on a written warning for these concerns. Has created issues for the Strauss Distribution House as well as the Area Manager in New York." (Doc. # 29-23). A current concern noted on the form was a failure to notify the Area Manager, Melnyk, prior to the meeting with Strauss of concerns Strauss had with Ecolab that led the Strauss Vice-President to state that the relationship between the two companies was fractured. Prior to Nadeau's termination, Krisher had considered "demoting" her

to a territory manager position but "at that point, there were no territories open for her to move into." (Doc. # 29-2, at 23, p. 53:15-17, and at 24, p. 54:7-8). Nadeau was replaced as the NewYork metro DSDM by a man named Dominic Disalvo, who had worked for Ecolab for approximately twenty years at that time. At some prior point in time Disalvo had been demoted due to his sales performance, failure to complete weekly reports, and failure to interact with Human Resources in a particular situation.

In the middle of 2013, Nadeau reported to Krisher that a Strauss employee told her that an Ecolab employee had made the comment that Nadeau was "just a girl from Connecticut and she was stealing New Yorkers' jobs." (Doc. # 37-1, at 12, p. 28:5-9). Krisher made a written report of this matter to Melnyk, who investigated the incident and eventually addressed the issue with two Ecolab employees. Krisher did not report this matter to Human Resources, because he felt it was a single event that Melnyk would be able to handle. He also did not think this comment constituted gender discrimination. Krisher subsequently followed up with Melnyk and learned that he "had a discussion with the [Ecolab] associate[s] and let them know that it was not acceptable." (Doc. # 29-2, at 13, p. 30:1-2).

On one occasion, Nadeau was explaining to an Ecolab Vice-President the difficulties she was having in New York, particularly working with Melnyk, and he responded by saying, "Well, you're going to because this is part of the good ol' boy's club and you don't have a set of balls." (Doc. # 29-1, at 2, p. 8:9-14). Nadeau does not recall the year in which this comment was made. She told Krisher about this comment, and he responded by saying, "We're going to have issues with Chuck [Melnyk]." (Doc. # 40-3, at 5, p. 22:21-22).

## II. STANDARD

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute." *American International Group, Inc. v. London American International Corp.*, 664 F.2d 348, 351 (2d Cir.1981) (internal quotation marks omitted).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute concerning a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party "must present specific evidence demonstrating a genuine dispute." *Gannon v. UPS*, 529 F. App'x 102, 103 (2d Cir. 2013). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute

as to the employer's intent . . . . Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) (citations omitted). The nonmoving party must "'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324). "[T]he standard for determining whether the evidence [is] sufficient to sustain the submission of plaintiff's case to the jury [is] simply whether on the basis of that evidence, a factfinder could reasonably find the essential elements of a case of discrimination . . . . [E]mployers should not be held liable for discrimination in the absence of evidence supporting a reasonable finding of discrimination." *James v. New York Racing Association*, 233 F.3d 149, 154-55 (2d Cir. 2000).

## III. DISCUSSION

Nadeau's Complaint alleges violations of the Connecticut Fair Employment Practices Act ("CFEPA") in three counts: Count One claims that Ecolab terminated Nadeau's employment on the basis of her sex in violation of Conn. Gen. Stat. § 46a-60(a)(1); Count Two claims that Ecolab's conduct created a hostile working environment in violation of Conn. Gen. Stat. § 46a-60(a)(8); and Count Three claims that Ecolab retaliated against Nadeau for opposing its discriminatory conduct in violation of Conn. Gen. Stat. § 46a-60(a)(4). Each of these claims will be discussed below.

### A. Sex Discrimination

In her Complaint, Nadeau alleges that certain conduct of Ecolab constituted "unlawful discrimination and termination of employment in violation of the Connecticut Fair Employment Practices Act." (Doc. # 1-1, at 5, ¶ 20). "CFEPA claims are analyzed in the same manner as Title

VII employment discrimination claims." *Vasquez v. Claire's Accessories, Inc.*, 392 F. Supp. 2d 342, 349 (D. Conn. 2005).[2] Claims of discrimination under Title VII, and under CFEPA, are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff must establish a prima facie case of discrimination by showing that: "(1) she belongs to a protected class; (2) she was qualified for the position at issue; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *Tubo v. Orange Regional Medical Center*, No. 16-632-cv, 2017 U.S. App. LEXIS 8629, at *2 (2d Cir. May 17, 2017) (summary order).

If a plaintiff establishes a prima facie case of employment discrimination, the burden of production shifts to the defendant "'to articulate some legitimate, nondiscriminatory reason' for the plaintiff's termination." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). "If the defendant proffers a nondiscriminatory reason for the termination, the presumption [of discrimination] falls away, and summary judgment for the defendant is appropriate unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Id.* (internal quotation marks omitted).

i. Prima Facie Case

Ecolab does not contest the establishment of the first three prongs of the *McDonnell*

---

[2]In her memorandum in opposition to the motion for summary judgment, Nadeau states that her "first cause of action is for discrimination on the basis of gender under Connecticut and Federal Law." (Doc. # 36, at 10). There is no reference to federal law in the Complaint. Because the analysis of a claim of discrimination in violation of CFEPA is the same as the analysis of a claim of discrimination in violation of federal law, i.e., Title VII, this discrepancy is of no significance in terms of the Court's ruling on this motion.

*Douglas* prima facie case. There is no dispute that Nadeau belonged to a protected class (female), was qualified for her position, and suffered an adverse employment action (termination). Ecolab's argument is that "no reasonable factfinder could infer that [Nadeau's] gender was a motivating factor in Ecolab's decision to terminate her employment. Accordingly, Plaintiff can neither establish a *prima facie* case nor meet her ultimate burden of proving gender discrimination." (Doc. # 29, at 29). Nadeau's response to Ecolab's argument is that "a finder of fact could clearly infer from the evidence presented that gender played a motivating factor in the decision-making regarding the termination of the Plaintiff." (Doc. # 36, at 16).

In her opposition memorandum, Nadeau also suggests that in addition to her termination, other "separate adverse actions" were taken against her. (*Id.* at 13). She identifies these actions as "receiving written warnings without any basis, and receiving decreased performance ratings in her performance reviews . . . ." (*Id.* at 12). Nadeau's Complaint does not include any claim or allegation relating to what she now characterizes as separate adverse actions. "A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the [summary judgment] motion." *Southwick Clothing LLC v. GFT (USA) Corp.*, 99 CV 10452 (GBD), 2004 U.S. Dist. LEXIS 25336, at *20 (S.D.N.Y. Dec. 15, 2004). Accordingly, the Court will not consider the warning letters or performance reviews as separate adverse employment actions taken against Nadeau.

Additionally, each of what Nadeau describes as other "separate adverse actions" would be considered a discrete act subject to the governing statute of limitations. *See Valtchev v. City of New York*, 400 F. App'x 586, 589 (2d Cir. 2010 ) ("negative evaluations" constitute discrete acts

-14-

that must be filed within the time period prescribed by statute). A claim under CFEPA "must be filed [with the Connecticut Commission on Human Rights and Opportunities ("CHRO")] within 180 days 'after the alleged act of discrimination.'" *Kahn v. Fairfield University*, 357 F. Supp. 2d 496, 503 (D. Conn. 2005) (quoting Conn. Gen. Stat. § 46a-82(e)). Nadeau filed her complaint with the CHRO on November 5, 2014. All of these other alleged acts of discrimination, i.e., the two performance evaluations and warning letters, occurred more than 180 days before Nadeau's CHRO complaint was filed and would be time-barred in any event. The Court also notes that, in general, neither negative performance evaluations nor reprimands constitute adverse employment actions for purposes of discrimination claims. See *Guerra v. Murphy*, 1:15-CV-1168 (LEK/TWD), 2016 U.S. Dist. LEXIS 179655, at *19 (N.D.N.Y. Dec. 29, 2016); *Dressler v. New York City Department of Education*, 10 Civ. 3769 (JPO), 2012 U.S. Dist. LEXIS 44249, at *18 (S.D.N.Y. March 29, 2012).

The remaining question with regard to the establishment of a prima facie case of sex discrimination is whether Nadeau's termination occurred under circumstances giving rise to an inference of discrimination. In considering this question, the Court bears in mind that "[t]he requirements to establish a prima facie case [under *McDonnell Douglas*] are minimal, and a plaintiff's burden is therefore not onerous." *Bucalo v. Shelter Island Union Free School District*, 691 F.3d 119, 128 (2d Cir. 2012) (internal quotation marks and citations omitted). In light of the fact that Nadeau was immediately replaced by a male employee, the Court will presume that she has meet her minimal burden of establishing a prima facie case of sex discrimination and proceed to the next step in the *McDonnell Douglas* analysis.

ii. Ecolab's Burden of Production

The second step under *McDonnell Douglas* requires the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. The defendant's burden at this stage is merely one of production, not persuasion. *See Cooper v. Connecticut Public Defenders Office*, 280 F. App'x 24, 25 (2d Cir. 2008) (internal quotation marks and alterations omitted) ("We note that the defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."). Ecolab contends that Nadeau's employment was terminated due to unsatisfactory performance, including persistent communication issues, as reflected in Nadeau's performance reviews and warning letters. "This reason is legally sufficient to justify a judgment for the defendant, and thus [Nadeau's] prima facie case has been rebutted by the defendant." *Id.* (citation omitted).

iii. Pretext

Once an employer has satisfied its burden of production at the second step of the *McDonnell Douglas* analysis, "the presumption [of discrimination] falls away, and summary judgment for the defendant is appropriate unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Tubo*, 2017 U.S. App. LEXIS 8629, at *2 (internal quotation marks omitted). In opposing Ecolab's motion for summary judgment, Nadeau suggests that an inconsistent application of Ecolab's disciplinary policy is evidence that would support a finding of gender discrimination. "Despite meeting expectations and meeting her financial goals set by the Defendant, the Plaintiff was terminated while two of her male counterparts were merely demoted for not meeting expectations." (Doc. # 36, at 15-16). Nadeau

also contends that she received negative performance reviews and written warnings after complaining to Krisher about gender-related comments and that these actions also support her claim of gender discrimination. Ecolab responds that undisputed evidence supports its stated reason for Nadeau's termination and that she failed to produce evidence to challenge the validity of that reason.

Nadeau was terminated in September 2014. The record reflects concerns expressed regarding certain aspects of her performance dating back to her annual review for the year 2012, which was prepared in March 2013. While that review recognized Nadeau's outstanding performance in establishing her own relationship with Strauss in 2012, it also noted that the relationship between the Ecolab team members and the Strauss team members "is one area that will need continued focus . . . in 2013 as not all the Ecolab team is engaged with Strauss and their 'go-to' person is always Trish. The comfort level between Strauss and Ecolab only exists between a few on both side[s]." (Doc. # 29-5, at 2). Nedeau's 2012 review also specified "[d]evelop[ing] a monthly newsletter" and "[c]ommunicating with Chuck [Melnyk] minimum of 2x per month verbally in addition to sending an update of the . . . Distributor Report via email 1x per month" as development actions to be taken in 2013. (*Id.* at 6).

Krisher issued the first warning letter to Nadeau in July 2013 for "[c]ontinually missing due dates and deadlines for Monthly Paperwork and Administrative items" including the monthly newsletter. (Doc. # 29-6, at 1). In her response to the warning letter, Nadeau did not deny missing deadlines. With respect to the monthly newsletter, she stated that "June is the only month where I have been late and I hardly believe that one month deserves to be written up for." (Doc. # 29-9). With regard to the late submission of a monthly sales "scorecard," she indicated that "[t]he only

way I could have done it on time would have been to submit [it] during my vacation." (*Id.*).

Nadeau's annual review for the year 2013, which was issued in March 2014, indicated a rating of "Meets Expectations," as opposed to the "Excels" rating she had received for 2012. (Doc. # 29-10, at 3). The summary section of the review stated that "[t]he area she will need to work on in 2014 if she is going to be successful is collaborating with the Ecolab team. There is still a divide between many of the [team members] and Tricia." (*Id.* at 2). The summary also noted that Nadeau's "communication with the Area Manager, Chuck Melnyk, will need to improve dramatically as well. Trish has a tendency to communicate with Chuck only through email rather than in person or over the phone. . . . If the communication does not improve it will dramatically impact the overall growth of Strauss and Ecolab. This will need to take top priority in 2014." (*Id.* at 2-3).

A second warning letter was issued to Nadeau on April 4, 2014. One specific area noted to be of significant concern was "communication with [Krisher] and other Ecolab associates . . . . There have been instances where communication failures have occurred between you and District Management, and Chuck Melnyk." (Doc. # 29-11, at 1). The letter went on to advise Nadeau that "you will need to communicate with Chuck either in person or over the phone at least 2x per month to review collaboration and engagement between the two teams [Strauss and Ecolab]." (*Id.* at 1-2).

Nadeau argues that she began to receive written warnings and decreased performance ratings after making complaints to Krisher about gender-based comments directed at her. "Sometime in the middle of 2013, the Plaintiff informed Jason Krisher that employees of the Defendant stated that she was just a girl from Connecticut and she was stealing New Yorker's

jobs. After making said complaint to Jason Krisher, the Plaintiff received [a] written warning."
(Doc. # 36, at 12-13) (citations omitted).

The Court does not find the issuance of the first warning letter to be "evidence that
reasonably supports a finding of prohibited discrimination." *Tubo*, 2017 U.S. App. LEXIS 8629,
at *2 (internal quotation marks omitted). The first warning letter was premised on Nadeua's
missing certain deadlines. Although Nadeua questioned whether the issuance of a warning letter
was warranted for missing deadlines, she acknowledged in her response that she did miss the
specified deadlines for the month of June. Additionally, after Nadeau reported the "just a girl
from Connecticut" comment to Krisher, he made a written report of this matter to Melnyk.
Krisher subsequently followed up with Melnyk and learned that Melnyk "had a discussion with
the [Ecolab] associate[s] and let them know that it was not acceptable." (Doc. # 29-2, at 13:1-2).
Krisher did not report this matter to Human Resources, because he felt it was a single event that
Melnyk would be able to handle. He also did not think this comment constituted gender
discrimination. There is no evidence before the Court of any other similar complaint made by
Nadeau after this action was taken.

Nadeau argues further that sometime after she received the first written warning, she
"again complained to Jason Krisher that another employee of the Defendant stated that she would
not be successful because she did not have a set of balls. Following this complaint, the Plaintiff
received a performance review for her 2013 performance and despite exceeding all of her sales
go[als], she received a rating of meeting expectations for alleged lack of communication. . . .
Shortly after receiving this performance review, the Plaintiff received a written warning for
alleged lack of communication." (Doc. # 36, at 13) (citations omitted).

Nadeau presents her argument in a fashion that suggests a temporal proximity between her complaint to Krisher about this comment and her receipt of a lower performance rating and then a second written warning. There is no evidentiary basis, however, to support the suggestion of a temporal proximity between these events. At her deposition, Nadeau testified as follows regarding when that comment was made:

> Q. I'm just asking you for the year.
> A. Yeah, I'm just not sure what year it was. It was a long time ago

(Doc. # 29-1, at 7, p. 20:21-23). Since there is nothing in the record to indicate when this comment was made, there is no evidence that reasonably supports a finding that any written warning or lower performance rating was linked to her complaint about that comment.

Nadeau also contends that she was "treated less favorably than two male employees that were similarly situated." (Doc. # 36, at 14). The evidence Nadeau relies upon in pursuing her unequal treatment argument is as follows: The individual who held the position of New York metro DSDM prior to Nadeau was a man named Joe Curran who was demoted from that position due to "[p]erformance issues," i.e., "[h]e did not meet his sales goals." (Doc. # 37-1, at 22, p. 49:6, 9). The individual who replaced Nadeau as the New York metro DSDM was a man named Dominic Disalvo. At an unspecified previous time, Mr. Disalvo had been demoted from a DM position to a SSDM[3] position due to "[s]ales performance[,] [h]is interaction with his team [and] [f]ollow-up." (Doc. # 37-2, at 7, p. 25:19-20). Prior to his demotion, Mr. Disalvo "wasn't doing his field trip letters, weekly reports in, and failed to interact with HR in a situation." (*Id.* at 7, p. 25:23-25).

---

[3]"The acronym was SSDM, which stood for street sales development manager." (Doc. # 37-1, at 22, p. 49:15-16).

Ecolab's Local Rule 56 (a)1 Statement includes the assertion that before Nadeau's employment at Ecolab was terminated, "Krisher first . . . explored the possibility of moving Plaintiff into a different position at Ecolab, though he did not identify any suitable position." (Doc. # 30, at 12, ¶ 78). That factual assertion is followed by a specific citation to the deposition testimony of Krisher. In her Local Rule 56(a)2 Statement, Nadeau admitted the facts asserted in paragraph 78 of Ecolab's Local Rule 56(a)1 Statement. (Doc. # 40, at 4, ¶ 78).

Given the paucity of evidence provided about the two male employees relied upon by the plaintiff for purposes of her unequal treatment argument, and in light of Nadeau's admission that prior to her termination Kirsher explored the possibility of moving her into a different position at Ecolab but did not identify any suitable position, the Court finds that the plaintiff has failed to "point to evidence that reasonably supports a finding of prohibited discrimination." *Tubo*,  2017 U.S. App. LEXIS 8629, at *2 (internal quotation marks omitted). *See Nuchman v. City of New York*, 639 F. App'x 48, 49 (2d Cir. 2016) (summary order) ("tenuous circumstantial evidence will rarely be sufficient to allow a rational factfinder to infer that the employer's reasons were mere pretext for intentional discrimination").

Because Nadeau has failed to satisfy her burden under *McDonnell Douglas* to show that the stated reason for her termination was a pretext for sex discrimination, Ecolab's motion for summary judgment is granted as to Nadeau's claim of sex discrimination.

### B. Hostile Work Environment

Nadeau claims that Ecolab "created a hostile work environment on the basis of sex." (Doc. # 36, at 20). In order to prevail on a hostile work environment claim, a plaintiff "must show that the workplace was so severely permeated with discriminatory intimidation, ridicule,

and insult that the terms and conditions of her employment were thereby altered." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness" *Id.* at 374 (internal quotation marks and citation omitted).

Nadeau's hostile work environment claim is based entirely on the two comments she reported to Krisher that were discussed above in connection with her sex discrimination claim. In 2013, Nadeau reported to Krisher that a Strauss employee told her that an Ecolab employee had made the comment that Nadeau was "just a girl from Connecticut and she was stealing New Yorkers' jobs." (Doc. # 37-1, at 12, p. 28:5-9). The second comment, made to Nadeau at an unknown time by an Ecolab Vice-President in response to Nadeau's explanation of the difficulties she was experiencing working in New York, and particularly with Melnyk, was, "Well, you're going to because this is part of the good ol' boy's club and you don't have a set of balls." (Doc. # 29-1, at 2, p. 8:9-14).

The Court finds that these two comments were "[i]solated acts" that "do not meet the threshold of severity or pervasiveness" necessary to sustain a hostile work environment claim. *Alfano*, 294 F.3d at 374. In determining whether the threshold has been met, courts consider "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"*Id.* (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)). At most, these comments were mere offensive utterances. Neither comment "is the type of severe event [such as a single incident of sexual assault] that would, by itself, give rise to a

hostile-work-environment claim." *Figueroa v. Johnson*, 648 F. App'x 130, 135 (2d Cir. 2016) (summary order). Additionally, "the plaintiff's allegations do not demonstrate a continuous or concerted series of incidents. Therefore, the plaintiff did not present sufficient evidence to support a hostile-work-environment claim." *Id.* The Court also notes that with respect to the "just a girl from Connecticut" comment, this incident was investigated and addressed by Nadeau's supervisors once it was brought to their attention.[4] Because Nadeau has not offered evidence sufficient to support a valid hostile work environment claim, Ecolab's motion for summary judgment is granted as to that claim.

## C. Retaliation

Nadeau also claims that Ecolab "retaliated against the Plaintiff for opposing the . . . unlawful and discriminatory conduct of the Defendant's agents/servants/employees by, inter alia, terminating her employment." (Doc. # 1-1, at 6, ¶ 27). Title VII retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). *See also Rivera v. Norwalk Public Schools*, CV116025724S, 2013 Conn. Super. LEXIS 2079, at *18 (Conn. Super. Ct. Sept. 13, 2013) ("In adjudicating [CFEPA] retaliation claims, courts follow the burden-shifting approach of *McDonnell-Douglas*").

_____

[4]At his deposition, Krisher testified that Nadeau never reported the second comment to him, i.e., the remark made by an Ecolab Vice-President. (Doc. # 29-2, at 25, p. 61:12-16). Nadeau testified at her deposition that she did report the second comment to Krisher and that he responded by saying, "We're going to have issues with Chuck [Melnyk]." (Doc. # 40-3, at 5, p. 22:21-22). In ruling on a summary judgment motion the Court is "bound to consider the facts in the light most favorable to . . . the non-moving party." *Simpson v. City of New York*, 793 F.3d 259, 262 (2d Cir. 2015). Thus, for purposes of this ruling the Court accepts as true Nadeau's testimony concerning the second comment.

To establish a prima facie case of retaliation, a plaintiff must show: "(1) that she participated in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between her engaging in the protected activity and the adverse employment action." *Gorzynski*, 596 F.3d at 110. If the plaintiff succeeds in establishing a prima facie case, "a presumption of retaliation arises [and] [t]he defendant must then articulate a legitimate, non-retaliatory reason for the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks and citation omitted). If the defendant does so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action."[5] *Id.* (internal quotation marks omitted).

Nadeau identifies as her protected activity her reports to Krisher of two comments concerning her. One, which occurred in the middle of 2013, was her report that a Strauss employee told her that another Ecolab employee had made the comment that Nadeau was "just a girl from Connecticut and she was stealing New Yorkers' jobs." (Doc. # 37-1, at 12, p. 28:5-9). The second comment was a response by an Ecolab Vice-President to Nadeau's statement about difficulties she was having in New York, particularly working with Melnyk. The Vice-President responded by saying, "Well, you're going to because this is part of the good ol' boy's club and you don't have a set of balls." (Doc. # 29-1, at 2, p. 8:9-14). Nadeau cannot recall the year in

---

[5]In *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013), the Supreme Court held that "a plaintiff making a retaliation claim under [TitleVII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." 133 S. Ct. at 2534. "The Connecticut Supreme Court has not yet addressed whether *Nassar* applies under the CFEPA." *Preston v. Bristol Hospital*, No. 3:12-cv-1252 (RNC), 2015 U.S. Dist. LEXIS 39853, at *10 (D. Conn. March 30, 2015).

which this second comment was made.

Ecolab contends that Nadeau did not engage in protected activity because in reporting these comments to Krisher she was not making a good faith complaint about prohibited discriminatory actions by Ecolab. "To bring a Title VII retaliation claim based on a complaint of unlawful activity, a plaintiff must demonstrate a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Sosa v. Local Staff, LLC*, 618 F. App'x 19 (2d Cir. 2015) (summary order) (internal quotation marks omitted). It is not at all clear that Nadeau's report to Kirsher about the "girl from Connecticut stealing New Yorkers' jobs" comment demonstrates a good faith belief that she was opposing statutorily prohibited discrimination. Her report to Kirsher about the Vice-President's comment, although not couched in terms of sex-based discrimination, appears somewhat less ambiguous in terms of being a protected activity. Recognizing the minimal burden imposed on a plaintiff for purposes of establishing a prima facie case under *McDonnell Douglas*, the Court will assume without deciding that Nadeau participated in a protected activity.

Nadeau clearly suffered an adverse employment action, i.e., her termination. The remaining question is whether Nadeau has shown "that there was a causal connection between her engaging in the protected activity and the adverse employment action." *Gorzynski*, 596 F.3d at 110. Nadeau argues that she has shown a causal connection on the basis of "temporal proximity" between the protected activity and adverse actions taken against her.[6] (Doc. # 36, at

---

[6]The Court has previously determined that other employment actions discussed by Nadeau in her opposition memorandum, i.e., performance evaluations and written warnings, were not included as claims or allegations in her Complaint and would, in any event, be time-barred as separate adverse actions pursuant to Conn. Gen. Stat. § 46a-82(e). This determination applies equally to the consideration of those same employment actions in the context of Nadeau's

18). "Temporal proximity between the exercise of a federal constitutional right and an allegedly retaliatory action is sufficient to establish a *prima facie* case of retaliation under Title VII, but only if it is very close. *Dotson v. City of Syracuse*, 15-3631, 2017 U.S. App. LEXIS 7089, at *7 (2d Cir. April 24, 2017) (internal quotation marks omitted). Because it is unknown when Nadeau reported to Kirsher the comment made to her by an Ecolab Vice-President, she has not shown temporal proximity between that activity and adverse action taken against her. The time between Nadeau's report to Kirsher of the "just a girl from Connecticut" comment in mid-2013  and her termination in September 2014 was approximately 15 months. The Court finds that this 15 month gap is insufficient to establish a causal connection between the protected activity and the adverse employment action. *See Murray v. Visiting Nurse Services of New York*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (Although the Second Circuit has not established a bright line defining the outer limits of temporal proximity, "district courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for in inference of causation").

Nadeau attempts to bridge the gap between the time of her protected activity and the time of her termination on the basis of the written warnings and performance evaluation she received after her protected activity. She characterizes these as "adverse actions taken by the Defendant." (Doc. # 36, at 19). The Court has previously explained that these events were not included as claims or allegations in the Complaint and would otherwise be time-barred as separate adverse actions. The Court recognizes that in certain cases courts have "overlook[ed] a longer gap in time

_____

retaliation claim. *See National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'" subject to the governing statute of limitations).

between protected conduct and an adverse employment action where the pattern of retaliatory conduct begins soon after the filing of the [] complaint and only culminates later in actual discharge." *Billue v. Praxair, Inc.*, Civil Action No. 3:05-cv-00170 (JCH), 2007 U.S. Dist. LEXIS 30744, at *27 (D. Conn. April 26, 2007) (internal quotation marks omitted). Even if the Court were to conclude on the basis of these other events that Nadeau had established a prima facie case of retaliation, however, her claim would not survive Ecolab's summary judgment motion.

Nadeau reported the "just a girl from Connecticut" comment to Kirsher in the middle of 2013. Kirsher issued a warning letter to Nadeau in July 2013 for the stated reasons of:

> Continually missing due dates and deadlines for Monthly Paperwork and Administrative items. Specifically, failing to send your Monthly Newsletter and Monthly DSDM Scorecard to me by the required due dates.

(Doc. # 29-6, at 1). In her response to the written warning, Nadeau acknowledged that her June newsletter was submitted two days late, but also stated that "June is the only month where I have been late and I hardly believe that one month deserves to be written up for." (Doc. # 29-9). With regard to the monthly scorecard, Nadeau responded that "[n]umbers were not posted prior to me leaving on vacation. The only way I could have done it on time would have been to submit during my vacation." (*Id.*).

Clearly there was temporal proximity between the reporting of the "just a girl from Connecticut" and the issuance of the first written warning. Although temporal proximity "may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, . . . without more, such temporal proximity is insufficient to satisfy [a plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*,

627 F.3d 931, 933 (2d Cir. 2010) (per curiam). Nadeau has failed to produce any evidence of pretext beyond temporal proximity with regard to the report of the "just a girl from Connecticut" comment and the issuance of the written warning issued in July 2013. In fact, Nadeau acknowledges that Krisher reported this matter to Melnyk, who investigated the incident and eventually addressed the issue with two Ecolab employees. Krisher subsequently followed up with Melnyk and learned that he "had a discussion with the [Ecolab] associate[s] and let them know that it was not acceptable." (Doc. # 29-2, at 13:1-2). With respect to the other events Nadeau relies upon, i.e., her March 4, 2014 performance review and the August 4, 2014 written warning, there is no temporal proximity between either of those events and the reporting of the "just a girl from Connecticut" in the middle of 2013. Nadeau has failed to demonstrate a "pattern of retaliatory conduct begin[ning] soon after the filing of the complaint and only culminat[ing] later in actual discharge." *Billue*, 2007 U.S. Dist. LEXIS 30744, at *27 (internal quotation marks omitted).

The Court concludes that Nadeau has failed to satisfy her ultimate burden under *McDonnell Douglas* of "establishing that it is more likely than not the employer's decision [to terminate her employment] was motivated, at least in part[7], by an intent to retaliate against [her]." *El Sayed*, 627 F.3d at 933. Consequently Ecolab's motion for summary judgment is granted as to Nadeau's retaliation claim.

_____

[7]Because the Court has concluded that Nadeau failed to meet the standard articulated in *El Sayed*, it is not necessary to determine whether the more stringent "but for" standard articulated by the Supreme Court in *Nassar* as to Title VII retaliation claims should apply to her CFEPA retaliation claim.

## IV.  CONCLUSION

For the reasons stated above, the defendant Ecolab's motion for summary judgment (**doc. # 28**) is **GRANTED**.

The Clerk is directed to enter Judgment in favor of the defendant Ecolab and close this case.

SO ORDERED this     25th          day of September,  2017.

_____/s/ DJS_____
                          Dominic J. Squatrito
                          United States District Judge